# IN THE COURT OF APPEALS OF TENNESSEE, AT JACKSON

**FILED**

**August 5, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **LINDA JANIECE WRIGHT-MILLER**, | ) | Dyer County Circuit Court |
| | ) | No. 96-234 |
| Plaintiff/Appellee. | ) | |
| | ) | |
| VS. | ) | C.A. No. 02A01-9708-CV-00196 |
| | ) | |
| **HARVEY GRANVILLE MILLER**, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |
| | ) | |

_____

From the Circuit Court of Dyer County at Dyersburg.
**Honorable Joe C. Morris, Chancellor, Sitting by Interchange**

**Thomas H. Strawn**, KELLY, MILLAR, STRAWN & KELLY, Dyersburg, Tennessee
Attorney for Defendant/Appellant.

**Douglas W. Wilkerson**,
**W. Lewis Jenkins, Jr.**,
WILKERSON GAULDIN & HAYES, Dyersburg, Tennessee
Attorneys for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs in part, Dissents in part by Separate Opinion)
**HIGHERS, J.**: (Concurs)

This is a divorce case. The parties, Granville Harvey Miller[1] (Husband) and Linda Janiece Wright-Miller (Wife), were married for approximately 5 years before a final decree of divorce was entered in August 1997.[2] During the marriage, the parties resided at a home located at 2166 Aztec Drive. On appeal, Husband challenges the correctness of the trial court's classification of this property as marital as well as its determination that the asset is unencumbered. Husband contends that the true owner of the property is Heartland Investments, Inc. (Heartland), a corporation that he founded prior to the parties' marriage and of which he is president and sole shareholder or, alternatively, that the parties own the property encumbered by a mortgage executed in favor of the corporation. Wife has also raised an issue with respect to the trial court's finding that there was no increase in value of Heartland stock during the marriage. After review of the record, we affirm in part and reverse in part. We set forth our reasons below.

Prior to trial, the parties stipulated that they would be divorced pursuant to the trial court's statutory authority set forth in T.C.A. § 36-4-129. They also stipulated that Wife had substantially contributed during the marriage to any increase in value of Husband's separate interest in Heartland stock. By consent order, it was agreed that the marital home would be sold on October 1, 1996, with the net proceeds (approximately $148,000) temporarily placed with the court clerk. The trial court subsequently entered an order acknowledging that all issues regarding division of property and debts had been settled by the parties except those concerning (1) the division of the proceeds of the sale of the house and lot located at 2166 Aztec Drive and (2) the division of any increase in value during the marriage of Heartland stock.

The following facts are not in dispute: Prior to the parties' marriage, Husband was the president and sole shareholder of two corporations: Heartland, which dealt primarily with the purchase and sale of real property and Miller Consolidated Services, Inc., which dealt with various plumbing and electrical services. The parties purchased the property at 2166 Aztec Drive by warranty deed which identifies the purchasers as "Harvey G. Miller and wife, Janiece Wright-Miller, as tenants by the entirety" and was recorded on September 13, 1993. On this day, the parties

---

[1]Mr. Miller testified that his name is Granville Harvey Miller although he is identified throughout the record as "Harvey Granville Miller."

[2]The parties' marriage was Husband's fourth and the second for Wife.

contracted to construct a dwelling on the property for a total price of $107,328.28. The contract provided that final payment was to be made when the "Customer," identified as "Harvey G. Miller and wife, Janiece Wright-Miller," either sold the house or moved onto the premises. The contract is signed by "Customer" as "Heartland Invest." and also includes the individual signatures of Husband and Wife. Heartland funds were used to purchase the property and construct the home. A consent resolution of Heartland, dated July 12, 1996, authorizes Husband, as president, sole shareholder and director of the corporation, to execute a deed of trust in the amount of $146,688.85 "in order to ensure repayment of said sum to the corporation upon the resale of said real estate . . . ." On August 20, 1996, Husband recorded a deed of trust on the property in favor of Heartland in this amount. It is signed by Husband only and states that the borrowed funds were due and payable in full to Heartland upon resale of the property. The July 1996 resolution makes reference to an August 1993 consent resolution which is signed by Husband and reads as follows:

CONSENT RESOLUTION OF
HEARTLAND INVESTMENTS, INC.
2380 UPPER FINLEY RD.
DYERSBURG, TENNESSEE 38024

By consent of the sole shareholder and director of the corporation the following resolution was adopted:

> RESOLVED, that the president and sole director of the corporation is hereby authorized to contract with VALLEY LAND DEVELOPMENT COMPANY to purchase a lot and construct a 3 bedroom single family dwelling for resale. Said officer is authorized to negotiate all terms and sign all necessary documents to procure a loan or use funds from HEARTLAND [INVESTMENTS]. The amount of the loan, withdrawal from HEARTLAND INVESTMENTS FUNDS are limited to a combined total of $150,000.00.

> Dated this the TENTH day of AUGUST, 1993.

The construction of the home was completed in June 1994.

At trial, Husband testified that he never intended to convey a one-half interest in the property to Wife and that within a couple of weeks of the warranty deed's execution, the parties executed a quitclaim deed prepared by Wife, "quitclaiming [the property] back to [Heartland]." The quitclaim deed was not produced at trial. According to Husband, the warranty deed identified the

parties as purchasers because the seller would not allow the property to be placed in a corporate name and would not accept an out-of-town corporate check at closing. Husband maintained that it was his intention that the house be purchased as an asset of Heartland and that it be sold for a profit to the corporation. He stated that "[the home] was for sale from the time that we started construction on it . . . ." He denied that the purpose for the construction of the home was to provide a residence for the parties.

Husband stated that a series of checks were written on Heartland's account to pay for the construction of the house. When asked whether these funds were a loan or "something else," he replied, "at that point, it was either a loan or this actually belongs to the corporation." When questioned further as to whether Heartland really owned the property or whether the company had loaned the parties the funds to purchase it, he answered, "[a]s of right now, it was a loan because the paper work that we had, I can't locate and it was never filed." He additionally testified:

> Q. And, your testimony is that it was your intent, at the time that you bought this property, that for [Heartland] to own it; is that right?
>
> A. Yes, sir, own it and sell it.
>
> . . . .
>
> Q. But today, because you can't find this Quitclaim Deed you say was made, you now say that [Heartland] loaned the money, and that [Heartland] ought to be repaid; is that basically what your position is about this house?
>
> A. Well regardless, either way you look at it, the money all came out of [Heartland] because we had no money.
>
> . . . .
>
> A. . . . . We could not possibly qualify for a [$175,000.00] house. Our income has never been that way, combined income. We could not go to the bank and get a loan. And, it was, like I say, it was a business.

Husband stated that Heartland received various loans from First Tennessee Bank which were personally guaranteed by him. He admitted that none of his personal financial statements presented at trial, dated from 1993 to June 1996, indicate that he owed Heartland any money. He explained that Wife had prepared the financial statements. He stated that Wife also prepared, on or about August 10, 1993, the consent resolution authorizing him to purchase the

property with Heartland funds. He admitted that a promissory note was never executed to Heartland but stated that there was a "minutes of the meeting promise" regarding the obligation. He could not produce the minutes of the meeting at trial, stating that the corporate record book was missing. He maintained that he and Wife, the corporate secretary, attended the meeting where they decided to build the house "for sale under Heartland Investments." He explained that a note was never executed to Heartland because "at [that] point it was going to be [Heartland] all the way."

Heartland presently owns three commercial properties in Fulton, Kentucky, all of which have been condemned by the city. In Tennessee, Heartland owns three rental properties, one commercial and two residential, and a warehouse located at 2380 Upper Finley Road where Heartland presently maintains its offices. Husband testified that the latter property was purchased in 1995. Miller Consolidated was dissolved in 1991 and its assets ($225,000) were folded into Heartland in 1993. Husband stated that Heartland had constructed about ten houses altogether and two within the last five years. He resided in one for a short time prior to the couple's marriage.

Husband believed Heartland to be about one-third the value it was when the parties married. He believed the decrease in value was primarily due to his failing health, the physical depreciation of the properties and the business's failing reputation with lending institutions. Husband stated that he is not presently employed due to his health problems and that Heartland is "just sitting there."

On direct examination, Husband testified that he was "almost positive" that the parties executed a promissory note to Heartland but that he was unable to obtain it because it was on a computer in Wife's possession. He maintained that he had been repaying the loan in increments of $1,000 per month ever since he and Wife had resided in the home. He explained that he was charging Heartland a management fee for his services and that when the company paid him $1,000 a month, he in turn paid this amount toward the note.

Husband stated that after a diligent search, he remained unable to locate all of the corporate books and records including those containing the quitclaim deed. He was questioned:

Q.      Did those books and records include, among other things, a quitclaim deed?

A.      Yes, sir.

Q.      Do you recall when that quitclaim deed was signed?

A.      It was signed on a Sunday afternoon in Fulton, Kentucky.

Q.      . . . .  And, who signed it?

A.      I signed it, my wife signed it and it was notarized, a local notary.

Q.      And, what did you all quitclaim?

A.      We gave up all the rights to the property?

Q.      To who?

A.      To the corporation.

. . . .

Q.      Did you ever record the original?

A.      No, sir, didn't have any reason to.

Husband requested that the court award the entire amount of net proceeds from the sale of the marital home to the corporation, stating that "[w]ell regardless, what happens is, I have got to satisfy that corporation.  I've got to pay that."

Wife testified that she and Husband prepared his personal financial statements together.  She never participated in any corporate meetings or prepared any corporate resolutions. When the parties first married, they resided at 2108 Aztec Drive.  They agreed to sell that property and buy a new house in another subdivision and reside there until construction of the home at 2166 Aztec was completed.  Wife stated that Husband never informed her that the home was going to be an investment of Heartland or that the purpose for constructing the home was to immediately list it for resale to a third party.  She said that "[Husband] always told me that house was our house . . . ."  and "I trusted that."  When the parties started having problems, Husband informed her that Heartland actually owned the property.  She denied ever preparing or executing a quitclaim deed regarding the property or signing any promissory note to Heartland.  She further testified:

Q.      Up until the time that you and Mr. Miller started having

marital troubles, to your knowledge, did either you or he ever pay [Heartland] any money for the money that went into the construction of this house?

A.     No, sir.

Q.     You are aware, . . . that . . . [Heartland] did issue it's checks to pay for the construction of this house?

A.     Yes, sir.

Q.     Did that seem unusual to you?

A.     No, sir.

Q.     Why not?

A.     Well, because [Heartland] -- there's always a lot of mixing of money. I mean, he's paid for personal expenses, he paid for anything he did put on his credit card and then he paid for it out of Heartland. And, the personal and company money was just always . . . it was just kind of all together.

Q.     That is, in fact, the way Mr. Miller operated, wasn't it?

A.     Yes, sir.


On cross-examination, Wife acknowledged that the contract for construction of the home at 2166 Aztec was signed by the "customer" as Heartland Investments as well as the individual parties. She explained, "[n]ormally, if [Husband] was doing something . . . and it was a company document, it would have Harvey G. Miller, President and he would have wanted Janiece Wright-Miller, Secretary. And then, he would sign as that position . . . ." She could not explain why Heartland had been written on the document in addition to the individual signatures of the parties.


Danny Harris, a certified public accountant, testified that he was familiar with the business of Heartland and, for a period of time, had prepared Husband's corporate financial statements. He stated that the company sustained a loss in operating income of approximately $30,000 in fiscal year 1993 and a loss of approximately $34,000 for fiscal year 1994. He explained that the company also realized a deferred gain of $72,000 in this year, representing the insurance proceeds from a fire which occurred in November 1991. For fiscal year 1995, the company realized a net profit in operations of $11,700, but in 1996, realized a loss in operations of $8,900. Harris explained that for fiscal years 1992 through 1996, there was a total increase in stockholder's equity of $223,000 due to the liquidation of Miller Consolidated which resulted in an increase in

Heartland's book value. When the contribution made from the liquidation of the subsidiary was excluded, Harris said that there was actually a $2,000 decrease in book value. Harris stated that "[w]ithout the contribution and deferred gain," he could not determine that there had been an increase in the company's book value for the years in question.

On cross-examination, Harris admitted that preparation of the financial statements were based on information provided by Husband. He made no independent verification. He utilized the income tax basis of accounting in preparing the financial statements and agreed that the statements alone could not be utilized to determine a fair market value of the company if the value of the properties owned had changed significantly from their original cost.

Andrew Harrington, a loan officer at First Tennessee Bank, testified that the bank had made various loans directly to Heartland with Husband as guarantor. For a loan made to Heartland in August 1996, the bank relied, in part, on the personal financial statement of Husband dated June 12, 1996 which did not reflect that Husband owed any debt to Heartland and expressly indicated that there were no mortgages against the 2166 Aztec property.[3]

Based upon the foregoing, the trial court classified the home at 2166 Aztec Drive as marital property and found that no mortgage or indebtedness existed against it. The court divided the net proceeds from the sale of the home equally between the parties.[4] The court also found that there had not been a "true increase" in the value of Heartland stock during the marriage.

Husband identifies two issues for review on appeal:

> I. Whether the trial court erred in adjudging that the residence occupied by the parties located at 2166 Aztec Drive in Dyersburg, Tennessee, was marital property.

---

[3]This financial statement states that it is accurate "as of January 1, 1996." It lists Husband's assets to include "real estate, two homes, one rental, one occupied, [at a value of] $210,000." Husband acknowledged that as of June 12, 1996 he occupied no home other than the one at 2166 Aztec Drive.

[4]After certain deductions, Wife was awarded $70,528.75 plus one-half of any accrued interest and Husband received $63,028.76 plus one-half of any accrued interest. The court denied Husband's motion to stay disbursement of the funds pending the outcome of this appeal.

II. Whether the trial court erred in adjudging that there was no mortgage indebtedness against the property occupied by the parties at 2166 Aztec Drive in Dyersburg, Tennessee.

Wife presents the following additional issues:

I. Heartland Investments, Inc. increased in value during the parties' marriage.

II. The plaintiff should receive her attorney's fees on appeal.

We first address whether the trial court erred in classifying the 2166 Aztec Drive property as marital. Wife argues that the trial court was correct in its classification. She asserts that although Husband used separate property (Heartland funds) to purchase the property, it was thereafter titled in the names of both parties as tenants by the entirety and that the property therefore became marital pursuant to the doctrine of transmutation. In ***Batson v. Batson***, 769 S.W.2d 849 (Tenn. App. 1988), the court recognized that separate property may become marital if its owner treats it as such. ***Batson***, 769 S.W.2d at 858. The ***Batson*** court defined the doctrine of transmutation as follows:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.
>
> 2 H. Clark, ***The Law of Domestic Relations in the United States*** § 16.2, at 185 (1987).

***Id***.

Husband argues that the presumption created by titling the property in the names of both parties as tenants by the entirety is rebutted by the following:

1.      The corporation could not buy the property in its own name by subdivision restriction.

2.      Evidence that the corporation has purchased a prior home in which the parties had resided during the marriage.

3.      All of the monies to purchase the lot and construct the house came from the corporation.

4.      The defendant clearly testified it was not his intention to make a gift of one-half (½) of this expensive property to the plaintiff.

5.      There still exists an outstanding indebtedness to the corporation of approximately $123,000.00.

6.      The defendant solely made the mortgage payments.

7.      The defendant solely paid the taxes on the property.

8.      The defendant solely maintained the property out of his income.

9.      The corporation normally purchased properties in this manner and sold them during the ordinary course of its business.

As to the first reason, we note that Husband testified that the property was titled in both parties' names as tenants by the entirety because the seller would not sell to a corporation. However, as Wife aptly points out, Husband could have titled the property in his name only if he intended the property to remain separate. As to the second, we find that evidence that the corporation had previously purchased a home in which the parties had resided inconclusive on this issue. As to the third stated reason, it is not disputed that the funds used to purchase the lot and construct the house came from Heartland. However, since the property was titled in both parties' names as tenants by the entirety, this fact gives rise to the issue of whether the doctrine of transmutation applies. Reasons 7 through 9 are not determinative of the issue but are merely factors to be considered. As to reasons 5 and 6, the record creates doubt as to whether an actual mortgage against this property ever existed. There is no promissory note indicating such and we agree with Wife that a listing of this debt on the corporation's financial statements may have been simply a tax strategy.[5] Moreover, if a mortgage against the property actually exists, this contradicts Husband's position that Heartland is the true owner of the property. These reasons along with reason 4 also address Husband's credibility.

---

[5]Mr. Harris stated that his accounting of the business reflected a "receivable from stockholder" in the amount of $110,636 as of May 31, 1996.

Clearly, resolution of the issue involves a determination of the credibility of the parties. The record includes contradictory testimony regarding Husband's intentions as to the ownership of this property. After review of the record, we find Husband's testimony in this regard inconsistent at best. He testified to a consent resolution authorizing him as president and sole shareholder to purchase the 2166 Aztec property and construct a home thereon using Heartland funds. The consent resolution introduced at trial is dated August 10, 1993 and signed by Husband. It identifies Heartland's address as "2380 Upper Finley Road." According to Husband's own testimony, however, this particular piece of property was not purchased until sometime in 1995. Thus, the date on which the consent resolution was actually executed appears suspect. Most telling, however, are the inconsistent positions taken by Husband at trial regarding the ownership of this property. Initially, Husband asserts that Heartland owns the property, having obtained title from the parties by a quitclaim deed. Husband, however, could not produce the deed at trial and Wife denies its execution. Inapposite to this position is Husband's testimony that the parties actually own the property, having purchased it with borrowed funds from Heartland, with the loan recognized by a promissory note and deed of trust. Again, no promissory note was introduced at trial. With respect to the deed of trust, the record indicates that a document of this kind was not executed until July 15, 1996, less than two months prior to the filing of Wife's complaint for divorce.[6] Finally, the record includes Husband's personal financial statement "as of January 1, 1996," which was prepared June 12, 1996, to list the property at 2166 Aztec as a personal unencumbered asset.

It is clear that the trial court accredited Wife's testimony. "Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro.*, 778 S.W.2d 423, 426 (Tenn. 1989). We find no error by the trial court in its classification of this property as marital. We further find the record to support the trial court's finding that no mortgage or indebtedness exists against the property for the reasons stated above.

---

[6]The deed of trust was recorded on August 20, 1996.

Wife presents the issue of whether the trial court erred in finding that there had been no increase in value in Heartland during the marriage. She argues that the evidence reveals that the value of Heartland increased during the marriage by at least $223,000. To support her position, she relies upon T.C.A. § 36-4-121(b)(1)(B) which states as follows:

> "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation and the value of vested pension, retirement or other fringe benefit rights accrued during the period of the marriage.

Wife asserts that "[t]he broad language of the statute includes any increase, which would seem to include an increase from receiving assets from a liquidating company."

It was Mr. Harris' testimony that without the consolidation of Miller or the deferred gain realized from the 1991 fire, Heartland actually sustained a loss in book value of approximately $2,000. Harris admitted on cross-examination that he utilized the income tax basis of accounting which relies upon the original cost of property in determining book value. The only other evidence presented regarding Heartland's value were the personal financial statements of Husband. On a statement dated June 1, 1993, Husband valued assets in Heartland at $410,000, at $528,000 in a statement dated May 31, 1994 and, as of January 1, 1996, he valued Heartland's assets at $585,000. Thus, Husband represented an increase in value of $175,000. Wife argues that the trial court should have divided the increase as reflected in Husband's financial statements. It is Husband's position that the only proof before the court revealed that the increase in book value resulted only from the consolidation of Miller's assets with that of Heartland. He asserts that the recognition of an actual increase in value under these circumstances "would be patently unfair and not in keeping with the intent or spirit of the statutory law of this state." We read the plain language of the statute to define marital property to include "any" increase in value. Our supreme court has held that "[t]he word 'any' is all inclusive" and has interpreted it to include an increase in value due primarily to inflation. *See Ellis v. Ellis*, 748 S.W.2d 424, 426 (Tenn. 1988). The parties agree that Wife substantially contributed during the marriage to any increase in value of Heartland stock.

In *Harrison v. Harrison*, 912 S.W.2d 124 (Tenn. 1995), Husband was deeded 125 acres prior to the parties' marriage. During the marriage, an interstate highway was constructed across the property which greatly increased the value of the farm. Our supreme court determined that it was separate property but held that the evidence did not support the wife's claim that she substantially contributed to the preservation or appreciation of the property, and thereby it was not marital property. The court went on to say:

> Application of the rule stated in *Ellis* to the facts of this case would require the conclusion that if the evidence proved that the wife had contributed substantially to the preservation and appreciation in value the entire amount of the increase in value would be marital property; but, since the evidence does not show that the wife substantially contributed to the preservation or appreciation of the property, the increase in its value is not marital property.

*Harrison*, 912 S.W.2d at 127. Whether a spouse has made a substantial contribution to the preservation and appreciation of the other spouse's separate property is a question of fact. Substantial contributions are not limited to direct contributions but also include indirect contributions such as "homemaker, wage earner, parent or family financial manager." T.C.A. § 36-4-121(b)(1)(C). A spouse's contributions must be real and significant in order to be substantial. However, they need not be monetarily commensurate to the appreciation in the separate property's value, nor must they relate directly to the separate property at issue. *Brown v. Brown*, 913 S.W.2d 163, 167 (Tenn. App. 1994). Unlike the *Harrison* case where it was determined that the evidence did not support the fact that the wife had made substantial contributions to the increase in value of the separate property, in the present case the parties stipulated that Ms. Wright-Miller did substantially contribute during the marriage to any increase in value of Heartland stock. Consequently, we conclude that Wife is entitled to an equitable share of the increase in value of Heartland which, as reflected in Husband's financial statements, totals $175,000.

We deny Wife's request for an award of her attorney's fees incurred in this appeal. The judgment of the trial court is reversed with respect to its decision that there has been no increase in value of Heartland stock during the marriage. We therefore remand this cause to the trial court for a determination of an equitable distribution of the increase in value realized by Heartland during the marriage. The judgment in all other respects is affirmed. Costs are assessed against Husband,

for which execution may issue if necessary.

_____
FARMER, J.


CRAWFORD, P.J., W.S.
(Concurs in part, Dissents in part by Separate Opinion)


_____
HIGHERS, J. (Concurs)