IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 27, 2013 Session

# MELODY CRUNK TELFER
v.
# GEORGE CURTISS TELFER

**Appeal from the Williamson County Chancery Court**
**No. 38088    D.J. Alissandratos, Chancellor, Sitting by Designation**

---

**No. M2012-00691-COA-R3-CV - Filed June 28, 2013**

---

This divorce appeal involves the classification of the appreciation in value of separate property.  During the marriage, the wife's family gave her ownership interests in two family companies.  The parties used marital funds to pay their tax liabilities arising out of income from the companies that was attributed to them for tax purposes but retained by the companies.  The trial court held that the appreciation in value of the wife's ownership interests in the family companies were her separate property.  We hold that, under the circumstances of this case, the parties substantially contributed to the preservation and appreciation in value of the wife's separate assets, and so reverse the trial court's classification of the appreciation in value as her separate property.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

James L. Weatherly, Jr., Nashville, Tennessee for Defendant/Appellant, George Curtiss Telfer

Ralph W. Mello, Nashville, Tennessee for Plaintiff/Appellee, Melody Crunk Telfer

# OPINION

## FACTS AND PROCEEDINGS BELOW

Plaintiff/Appellee Melody Crunk Telfer ("Wife") and Defendant/Appellant George Curtiss Telfer ("Husband") were married in 1985. Until 2000, Husband worked in the automotive finance and banking industry and Wife worked in sales. During that time, both parties deposited their employment earnings into a joint checking account.

Wife's father, John Crunk, was the chairman and owner of RJ Young Company. In 1995, Mr. Crunk decided to transfer ownership of some of his assets to Wife through the creation of business entities, in order to avoid the payment of gift and inheritance taxes upon his death. One of the entities Mr. Crunk set up was Crunk Connected Products ("CCP"), a partnership that owned the real estate upon which RJ Young was situated.[1] Mr. Crunk began gifting Wife a percentage of the ownership interest in CCP. By October 1999, by virtue of Mr. Crunk's gifts, Wife owned a 74.8% interest in CCP, valued at $416,795.

Beginning in 2000, Wife began receiving distributions from CCP in the amount of $8,500 per month. These distributions were deposited into the parties' joint checking account and used to pay marital expenses. These distributions and other income from companies belonging to Wife's family were sufficient to enable Wife to cease working outside the home.[2]

Subsequently, Mr. Crunk decided to equalize the distribution of his assets between Wife and her brother. To do so, in May 1999, Mr. Crunk created another business entity, Young Leasing, LLC, for the purpose of transferring wealth to Wife.[3] Neither Husband nor Wife was involved in setting up Young Leasing, and Wife was not present when the company was

---

[1] It appears that RJ Young paid monthly rent to CCP. The rent money was in turn used to repay loans taken out by CCP, and then some of the remaining monies were distributed to the owners. CCP also owned a digital sign and a condominium in Florida; both generated revenue for the company. Based on the K-1 statements, it appears that, beginning in 2002, the majority of the money earned by CCP was retained in the company.

[2] In 1999 or 2000, Wife began working for RJ Young Company, earning approximately $1900 per month. This was also deposited into the parties' joint checking account.

[3] Similar to CCP, it appears that Young Leasing had no employees and all of its business was comprised of RJ Young Company's equipment lease agreements and service agreements for RJ Young customers. Young Leasing apparently paid RJ Young for the lease agreements in an amount that exceeded the cost of the equipment, so that RJ Young received a profit on every lease; however the revenues generated by the leases remained with Young Leasing and ultimately enured to Wife's benefit.

created. The sum of $900 was paid for Wife's 90% ownership interest in the company.[4] Prior to the $900 payment, Young Leasing had no assets. Young Leasing did not immediately make any distributions to Wife, and in fact operated at a loss until 2005.

As a result of the companies set up by Wife's family, the parties had significant tax liabilities. Income reflected on the K-1 statements from CCP and Young Leasing was included in the parties' joint income tax returns. However, from 1999-2006, the parties received no monies from CCP or Young Leasing to pay the increased tax liability incurred as a result of Wife's ownership interest in the companies. Consequently, they paid the increased income taxes with marital funds. It appears from the record that the parties paid the taxes on all of the income generated by CCP and Young Leasing each year, regardless of whether the companies' income was retained or distributed to Wife.

In 2005, for the first time, Young Leasing did not operate at a loss. That year, it earned approximately $619,000; these earnings were retained by the company. This 2005 income was reported on the K-1 statements for Wife, even though the income was not distributed to her. As a result, in 2006, this "phantom" income attributed to Wife, in addition to the parties' other sources of income, generated a personal tax liability of approximately $331,000.

When the parties were notified on approximately April 5 or 7, 2006 of this looming $331,000 tax liability, they realized that they were unable to pay the tax liability from their earnings and distributions from CCP. In order to pay the taxes, on April 17, 2006, Husband liquidated the parties' joint brokerage account, which contained approximately $317,000 that Husband inherited from his aunt. After liquidating this joint account, a check was written to the United States Treasury for the outstanding tax liability. However, the parties were concerned about the waiting period associated with the liquidation of the brokerage account, so on April 18, 2006, Husband withdrew $300,000 from the home equity line of credit on the marital residence, in order to temporarily cover the tax liability until the brokerage funds became available. On April 25, the money from the brokerage account was deposited into the parties' joint checking account and that same day Husband repaid the $300,000 loan on the home equity line of credit; this left the joint brokerage account completely depleted.[5] It is undisputed that the funds used to pay this tax liability were marital.

---

[4] The record is unclear as to the origin of the $900 payment on behalf of Wife.

[5] Apparently, the parties had earmarked the funds in this joint brokerage account for a particular piece of property known as "Rock Island," which was under construction. After the joint brokerage account was liquidated to pay their taxes, the parties decided to continue with the "Rock Island" project using funds from Wife's trust account.

After the kerfuffle over the 2005 phantom income from Wife's companies and the resulting 2006 tax liabilities, Young Leasing began making distributions to Wife of $75,000 per quarter, an amount that correlated with quarterly tax estimates. After that, quarterly checks were apparently deposited into the parties' joint checking account. In turn, the parties made quarterly payments to the IRS, thus avoiding the difficulty that arose in April 2006.

Meanwhile, in 2003, Husband left the banking industry and started his own company, Telfer Investments, to build and sell expensive homes. Husband used marital funds to finance the company, but titled it in his name only. For all intents and purposes, Husband ran Telfer Investments and Wife had little to do with its operations. The timing proved unfortunate; the housing market declined and Husband's venture accumulated a great deal of debt. As a result, in 2009, Wife's family paid off the debt associated with Telfer Investments, and Husband in turn transferred control of the company to Wife. The losses associated with Telfer Investments were included on the parties' joint income tax return and were used to offset the income from Wife's companies, both distributed and retained.

The financial issues and numerous other factors placed strain on the parties' marriage. In 2010, Wife filed a complaint for divorce in the Chancery Court for Williamson County, Tennessee, alleging irreconcilable differences. Contentious litigation ensued over numerous issues, most of which are not pertinent to this appeal. The litigation included sharp disputes over the primary issues in this appeal, namely, the classification of Wife's companies and their appreciation in value as either separate or marital property, for purposes of equitably dividing the marital estate.

At a pretrial conference held in November 2011, the parties agreed to bifurcate the divorce trial, in order to first address the classification issues associated with Wife's interests in CCP and Young Leasing.[6] Prior to the bifurcated hearing, the parties stipulated to the following facts:

> A. The parties stipulate that [Wife] owned the 74.8% interest in Crunk Connected Products at issue in the first part of this litigation as her separate property in October 1999 and that the value of her 74.8% interest in Crunk Connected Products, LLC at that time was $416,795.
>
> B. The parties further stipulate that the value of said 74.8% interest in Crunk Connected Products, LLC at the time of trial, and for purposes of this divorce, is between $2,859,100 and $5,854,087.

---

[6]The second part of the divorce trial was to address all of the remaining issues, including the equitable division of marital property, alimony, and parenting issues.

C. The parties further stipulate that at the time of trial, and for purposes in this divorce, the value of the 90% interest in Young Leasing, LLC at issue in the first part of this litigation is between $672,400 and $1,750,009.

Thus, the parties stipulated that CCP should be classified as Wife's separate property, but did not stipulate that Young Leasing was her separate property.

Consequently, the trial court held an evidentiary hearing in December 2011 to address first the classification of Young Leasing and then, if Young Leasing were held to be the Wife's separate property, the classification of the appreciation in value of both of Wife's companies. At the hearing, the trial court heard testimony from several witnesses, including Husband, Wife, Wife's father Mr. Crunk, and a certified public accountant who testified as an expert witness for Husband.

With respect to the classification of Young Leasing, the evidence adduced at the hearing showed that Wife acquired her interest in the company during the marriage. An operation agreement entered into evidence stated that $900 was paid on Wife's behalf for her 90% interest in Young Leasing. Wife testified that her father gifted Young Leasing to her and that she did not make the $900 capital contribution to form the company. Wife said that she "was not privy to how these companies were set up, but I know I did not write a check or bring my own money into this."

 Mr. Crunk corroborated Wife's testimony on this issue. He explained that Young Leasing was set up as an effort "to try to equalize the assets between [his son and Wife]." At first Mr. Crunk was unsure of the origin of the $900 initial investment to form Young Leasing, but then later said that he believed that the $900 was supplied by RJ Young. Mr. Crunk testified that RJ Young did all the bookkeeping and collections for Young Leasing and that Young Leasing had no employees.

In his testimony, Husband acknowledged that neither he nor Wife made any cash contribution in order for Wife to acquire her ownership interest in Young Leasing. A CPA hired by Husband as an expert witness, Thomas Price, testified that there was likely no capitalization for Young Leasing and the $900 payment referenced in the operating agreement was in fact a loan from RJ Young to Young Leasing, as opposed to a capital contribution. Mr. Price testified that the payment more closely resembled "a liability paid back to the entity that was loaning the thousand dollars."

Both parties testified at the evidentiary hearing about how they handled their finances during marriage. Wife conceded that she made no attempt to keep the parties' money separate

during their marriage. She said that they just put the money she received from her businesses "in a joint checking account." Wife's testimony indicated little knowledge of where her income came from each month. She said that she was unfamiliar with the separate checks from CCP and Young Leasing; she explained that she just knew that she "got money from the company and was able to live off of it." She professed to not know what a K-1 statement was. Wife confirmed that she was the majority owner of CCP, but said that she never reviewed the company's operating agreement to ascertain her rights as majority owner; she chose instead to just leave those decisions to her family.

Husband confirmed that the parties made no attempt to separate their money; all of their earnings were deposited into a single joint bank account. As to the distributions to Wife made by CCP, Husband testified that no distributions were made until 1999. He explained that, from 1995 to 1999, the parties received K-1 statements from CCP but no income. Once CCP began making distributions, Husband said, they got monthly checks of $8,500. These monthly checks were deposited in the parties' joint account and there was no attempt to keep the funds separate from other family money used for marital expenses. Any remaining incomeearned by CCP, Husband testified, was retained by the company and not distributed.

Husband testified that, after Young Leasing was formed in 1999, the parties continued to pay the taxes associated with the income that was distributed to them, as well as the taxes on any income that was attributed to them for tax purposes but retained by the companies. He said that all of those taxes were paid with marital funds from the parties' joint checking account.[7] Husband testified that the parties' April 2006 scramble to pay their taxes arose because CCP and Young Leasing reported substantially more income on the K-1 statements for 2005, and this suddenly increased the parties' annual income from approximately $225,000 to over a million dollars. Asked if there was a discussion in April 2006 about the companies distributing money to Wife to pay the taxes associated with the retained income, Husband said that he and Wife discussed it and Wife spoke with members of her family, but "the bottom line was that there wasn't going to be a distribution to cover this tax liability." To cover the tax liability, Husband said, he drew against his inheritance that he had deposited in the parties' joint brokerage account as well as the home equity line of credit on the marital home. After their check to the IRS cleared, the home equity line of credit was repaid, but the joint brokerage account that had contained Husband's inheritance was closed.

After the April 2006 tax incident, Husband testified, Young Leasing began making quarterly distributions to Wife of $75,000 per quarter "in correlation to the quarterly tax estimates that would be due." Husband said that each such distribution from Young Leasing was deposited into the parties' joint checking account. The parties then sent a corresponding quarterly

_____

[7]The K-1 statements in the record appear to indicate that Young Leasing operated at a loss until 2005.

income tax payment to the IRS. Husband explained that, at some point in 2007, the deposits into the parties' joint checking account from CCP and Young Leasing were combined, so one of the statements reflected a direct deposit into the parties' checking account of $83,500.

Husband also identified the checks from the parties' joint checking account that were sent to the United States Treasury and the IRS for income tax payments. A few of the checks were signed by Wife, but most were signed by Husband. The tax payments were in varying amounts.[8] Husband testified that the parties "never discussed" filing separate income tax returns.

At the conclusion of the first part of the bifurcated proceeding, the trial court issued an oral ruling on the issues that were the subject of the hearing. At the outset, the trial court commented that all of the witnesses who testified were "very truthful and honest with this Court."

In the oral ruling, the trial court first made the factual finding that Wife's father intended the two companies to be gifts to Wife and that "she didn't earn it." Thus, the trial court concluded that Wife's ownership interests in the companies were her separate property. It then addressed whether the appreciation in the value of the companies during the marriage should be classified as marital property. The trial court explained its view of the evidence on the distributions made by Wife's companies and the parties' payment of their tax liability, and whether Husband had substantially contributed to the appreciation in value of the companies:

> Now, all we have from that cash flow that came out. And [Wife] chose to –
> I think appropriately, to put that into the joint funds that they had at the bank.
> They had a joint account.
>
> But the payment of the money from that cash flow for taxes did nothing, in this
> Court's opinion, to meet the statutory obligation, which is that you must show
> that there has been by both parties a substantial contribution to the preservation
> and appreciation of the assets. It didn't do that, and I've listened carefully, and
> I appreciate the argument to the contrary, but I just respectfully disagree with
> that. It didn't do a thing to preserve either [CCP] or Young Leasing. It didn't
> do a thing to preserve that asset in any shape, form, or fashion that this Court
> can see. . . .

_____

[8]Most of the checks to the United States Treasury are in the amount of $75,000. However, several are in amounts that exceed $75,000, *e.g.,* $117,100 in January 2007, $120,000 in April 2007, and others are less than $75,000, *e.g.,* $52,000 in September 2008.

But the mere fact that the cash flows from these [companies] went into a joint account and were used to pay the taxes that naturally come from the income does not preserve the corpus, which is the leasing company and the partnership. Therefore, accordingly, the Court does find that this is not a marital asset, that [Husband] has no interest in, as a matter of law, in Young Leasing or in [CCP].

Thus, the trial court held that the fact that the checks from the companies were deposited into a joint account, and the fact that the payment of the parties' tax liabilities were paid from joint assets, did not amount to a substantial contribution to the appreciation in value of the companies. For that reason, the trial court held that the appreciation in the value of the companies during the parties' marriage was also Wife's separate property, and thus would not be included in the trial court's equitable division of the marital property.

In February 2012, the trial court's oral findings on these issues were incorporated by reference into the written order that adjudicated all of the issues in the divorce litigation. Pertinent to this appeal, the written order held that Wife's interest in both companies was "her separate property when acquired by her and remain her separate property" and that Husband "has no marital interest in either property." Husband now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Husband raises numerous issues and subissues:

I. Whether the trial court erred in classifying the appreciation of [Wife's] interest in Crunk Connected Products and Young Leasing, LLC, as separate property?

A. Whether the parties substantially contributed to the preservation and appreciation of Crunk Connected Properties and Young Leasing, LLC, by filing joint tax returns and using martial funds to pay the increased tax liability associated with [Wife's] interests?

B. Whether the parties substantially contributed to the preservation and appreciation of Crunk Connected Products and Young Leasing, LLC by using marital business losses from Telfer Investments to reduce the increased tax liability associated with [Wife's] interests?

-8-

C. Whether the parties substantially contributed to the preservation and appreciation of Crunk Connected Products and Young Leasing, LLC by using assets inherited by [Husband] and the equity in the jointly owned marital residence to pay the increased tax liability associated with [Wife's] interests in 2005?

D. Whether the partie[s] substantially contributed to th[e] preservation and appreciation of Crunk Connected Products and Young Leasing, LLC by using [Husband's] marital earnings to [pay] the family's expenses?

E. Whether's [Wife's] interest in Young Leasing, LLC, constituted marital pro[p]erty pursuant to Tenn. Code Ann. § 36-4-121(b)(1)(A)?

II. Alternatively, whether [Husband] should be awarded an equitable portion of the assets used by [Wife] to appreciate and preserve her ownership interest in Crunk Connected Products and Young Leasing, LLC, under the doctrines of unjust enrichment and dissipation?

A. Whether [Husband] should be reimbursed his inherited monies used to pay the 2005 tax liability incurred as a result of [Wife's] ownership interest in Crunk Connected Products and Young Leasing, LLC, under the doctrine of unjust enrichment?

B. Whether [Husband] should be awarded an equitable portion of the value of the marital business losses used by [Wife] to appreciate and preserve her ownership interest in Crunk Connected Products and Young Leasing, LLC under the doctrines of dissipation and unjust enrichment?

III. Whether [Husband] should be awarded his attorney's fee at trial and on appeal?

In addition to responding to Husband's arguments, Wife contends that Husband's appeal should be dismissed for failure to comply with Rule 7 of the Rules of the Court of Appeals.

Questions regarding the classification of property as marital or separate are inherently factual. The trial court's findings of fact regarding the classification of an asset are reviewed

*de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Owens v. Owens***, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). The trial court's conclusions of law are reviewed *de novo,* with no presumption of correctness. ***Larsen-Ball v. Ball,*** 301 S.W.3d 228, 232 (Tenn. 2010); ***Union Carbine Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

## ANALYSIS

### Tenn. Ct. App. R. 7

As a preliminary matter, we address Wife's argument that Husband's appeal should be dismissed because he failed to include a Rule 7 table in his appellate brief.[9] Rule 7 of the Rules of the Court of Appeals states that, in any domestic relations appeal in which "either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt," the brief of the party raising the issue must include a table listing all property and debt considered by the trial court. Tenn. Ct. App. R. 7(a). This Court has previously held that issues on appeal involving the valuation and division of property can be waived for failure to comply with Rule 7. ***See, e.g., Harden v. Harden***, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8; 2010 Tenn. App. LEXIS 419, at *21 (Tenn. Ct. App. June 30, 2010).

In this case, the issues on appeal are limited to the classification of Young Leasing and the appreciation in value of both of Wife's companies. The proceedings below were bifurcated and the underlying facts concerning the monetary value of the appreciation of the companies have been stipulated. Under these circumstances, we exercise our discretion under Rule 1(b) of the Rules of the Court of Appeals and consider the merits of the appeal, despite Husband's failure to comply with Tenn. Ct. App. R. 7. ***See*** Tenn. Ct. App. R. 1(b).

### Classification as Marital or Separate

The remaining issues on appeal center on the classification, as marital or separate property, of Wife's ownership interest in Young Leasing and the appreciation in the value of both businesses acquired by Wife during the marriage, CCP and Young Leasing.

The classification of a particular asset as separate or marital is a question of fact which must be determined in light of the all the circumstances. ***Snodgrass v. Snodgrass***, 295 S.W.3d 240, 245 (Tenn. 2009). Tennessee Code Annotated § 36-4-121 defines the key terms and sets forth the parameters for the determination:

---

[9]After Wife raised the Rule 7 issue in her appellate brief, Husband included a Rule 7 table in his reply brief.

(b) For purposes of this chapter:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . .

(B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation . . . .
. . .
(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

Tenn. Code Ann. § 36-4-121(b). The spouse who seeks to include the other spouse's property in the marital estate has the burden of proving that the property fits within the statutory definition of marital property. ***Keyt v. Keyt***, 244 S.W.3d 321, 328 (Tenn. 2007). In this case, therefore, Husband bears the burden of proof.

We address first the issue of whether Young Leasing is Wife's separate property. Husband argued at the trial, and now argues on appeal, that Young Leasing is marital property. The trial court below held that Young Leasing was Wife's "separate property when acquired by her and remain[s] her separate property."

On appeal, Husband argues Young Leasing should be deemed marital property because it was formed during the marriage, had no assets when formed, and the proof is unclear as to the origin of the $900 initial payment on Wife's behalf to acquire her 90% ownership interest in the company. The value of Young Leasing when formed, or the lack thereof, may impact the monetary value of its appreciation during the marriage, but we do not see how it affects whether the company is marital property. Wife's father, Mr. Crunk, testified that he gifted the interest in the company to his daughter. He explained that his intent was to "equalize" assets between his children and avoid gift taxes, and that this business would be worth a great deal. While the evidence on the origin of the initial $900 payment on Wife's behalf was not clear, Husband put on no proof that it came from marital funds. From our review of evidence, we cannot conclude that it preponderates against the trial court's finding that Young Leasing was gifted to Wife by her father and is Wife's separate property. ***See Fox***

-11-

*v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *4 (Tenn. Ct. App. Sept. 1, 2006). Therefore, we affirm the trial court's factual finding on this issue.

We consider next Husband's argument that the appreciation in value of both CCP and Young Leasing constitutes marital property that should have been included in the trial court's equitable division of the marital estate. As set forth in Section 36-4-121, quoted above, in order for the appreciation in value of Wife's separate property to be deemed marital property, Husband must prove that each party substantially contributed to its preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(D).

Whether a spouse substantially contributed to the preservation and appreciation of the other spouse's separate property is a question of fact. *Keyt*, 244 S.W.3d at 329 (citing *Sherrill v. Sherrill*, 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992)). Such a contribution may be either "direct" or "indirect." Tenn. Code Ann. §36-4-121(b)(1)(D); *McFarland v. McFarland*, No. M2005-01260-COA-R3-CV, 2007 WL 2254576, at *6; 2007 Tenn. App. LEXIS 509, at *17-18 (Tenn. Ct. App. Aug. 6, 2007). Regardless, it must satisfy two requirements. First, "some link between the marital efforts of a spouse and the appreciation of the separate property must be established before the separate property's appreciation is considered marital property." *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 746 (Tenn. 2002); *see also Keyt*, 244 S.W.3d at 329. Second, the contribution must be "real and significant." *Keyt*, 244 S.W.3d at 329; *Wright-Miller v. Miller*, 984 S.W.2d 936, 944 (Tenn. Ct. App. 1998) (citing *Brown v. Brown*, 913 S.W.2d 163, 167 (Tenn. Ct. App. 1994)). However, the contributions of the spouse who seeks to have the appreciation deemed marital property "need not be monetarily commensurate to the appreciation in the separate property's value, nor must they relate directly to the separate property at issue." *Wright-Miller*, 984 S.W.2d at 944.

On appeal, Husband makes several arguments on this issue. We focus on his first argument, that the parties substantially contributed to the preservation and appreciation of Wife's companies "by including the income distributed and retained by the companies in the parties' joint tax returns and using marital funds to pay the increased tax liability created by [Wife's] business interests."

As authority, Husband cites this Court's decision in *Schuett v. Schuett*, No. W2003-00337-COA-R3-CV, 2004 WL 689917; 2004 Tenn. App. LEXIS 193 (Tenn. Ct. App. Mar. 31, 2004). *Schuett* involved the equitable division of marital property; the property at issue was an investment account inherited by the wife that remained in her name only. The trial court classified the increase in the value of the account as separate property, and on appeal the husband claimed that it should have been classified as marital property. The investment account generated income due to both dividends and capital gains. The resulting taxes were paid with her husband's employment income, a marital asset. *Schuett*,

2004 WL 689917, at *3; 2004 Tenn. App. LEXIS 193, at *10-11.  The income generated by the investment account was reinvested back into the account each year.  The payment of the parties' income taxes on the income from the account with marital funds in *Schuett* permitted the wife's investment account to grow, because the alternative was to use the income generated by the account to pay the parties' tax liabilities associated with the account.  The husband argued on appeal that the payment of the income taxes arising out of the wife's separate investment account with marital funds substantially contributed to the preservation and appreciation in value of the account.

The appellate court in *Schuett* agreed with the husband's argument.  It noted that, for ten years, "all income generated by the [wife's] account was always reinvested back into the account to allow it to grow" because the parties had paid the taxes associated with the account's capital gains and dividend income from their marital funds.  *Schuett*, 2004 WL 689917, at *3; 2004 Tenn. App. LEXIS 193, at *11 (citations omitted).  The *Schuett* Court reasoned:

> Not only did such actions constitute preserving the separate asset, allowing it to grow rather than using funds in the account to pay taxes, but, by utilizing marital funds to pay the taxes rather than funds in the account itself, such contributions allowed the [investment] account to appreciate more than it otherwise would have, if the funds in the account been used to pay the income taxes.

*Schuett*, 2004 WL 689917, at *3; 2004 Tenn. App. LEXIS 193, at *11.  Thus, the appellate court in *Schuett* reasoned that the corpus of the wife's investment account grew because marital funds were expended to cover the parties' tax liabilities, allowing the wife to avoid using money in the account or generated by the account to pay those tax liabilities.

Wife contends that the principles on which the Court relied in *Schuett* are inapplicable here.  She notes first that the wife in *Schuett* admitted that the income from which the tax liabilities arose, and for which the marital funds were expended, was reinvested in the wife's investment account, whereas in the present case the distributions were placed in the parties' joint bank account and used to support the parties.  Wife also points out that *Schuett* involved an investment account as opposed to "family businesses that grew through continued efforts and gifts of family members."  She emphasizes that the wife in *Schuett* was financially dependent on the husband; his employment income paid the taxes on the wife's investment account as well as all marital expenses.  In the present case, Wife contends, Wife contributed the money to the marital estate that paid the taxes on her companies and Husband provided little or no income to pay the marital expenses.  In support of her position, Wife cites *Crocker v. Crocker,* No. 02A01-9801-CH-00014, 1999 WL 250184, at *4-5

(Tenn. Ct. App. April 28, 1999), in which business losses generated by the wife were deemed to have contributed to the husband's overall net worth only by permitting him to use those losses to offset his income for tax purposes, and were not a contribution to the appreciation or preservation of a specific asset.

In the case at bar, Wife received substantial distributions from both companies. She received $8,500 per month from CCP, and, beginning in 2006, she received $75,000 quarterly distributions from Young Leasing. These distributions were deposited into the parties' joint account, along with any employment income the parties earned. The funds in the parties' joint bank account were used to pay both marital expenses and the parties' income tax liabilities.[10] Because the distributions were deposited in the parties' joint bank account with other marital funds, with no intention to keep them separate, Wife's distribution income was commingled and became a marital asset.[11] *See Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) ("Separate property becomes marital property by commingling if inextricably mingled with marital property.").

Husband argues on appeal that the fact that the distribution income from the companies was deposited into the parties' joint bank account and was included on the parties' joint income tax return militates in favor of a finding that the appreciation in the value of the companies was marital property. We see no link between this fact and the preservation or appreciation in value of Wife's companies. It indicates only that the periodic distributions from the companies constituted marital property, but that is not in question on appeal. Therefore, we must reject this argument by Husband.

Husband also contends that the parties' use of marital funds to pay the parties' income taxes associated with the distributions Wife received from the companies weighs in favor of a finding that the appreciation in value of the companies is marital property. Again, we do not see a connection between the payment of the parties' income taxes on the distribution income and the appreciation or preservation of Wife's companies as a whole. The payment of the parties' tax obligation on this income did not serve to "preserve the corpus" in the companies, and we do not view it as a basis to conclude that the parties substantially contributed to the appreciation and preservation of Wife's companies. *Schuett*, 2004 WL 689917, at *3; 2004 Tenn. App. LEXIS 193, at *11.

---

[10] Prior to receiving the quarterly disbursements of $75,000, the parties' paid the tax liabilities associated with the companies with their marital assets only.

[11] "Commingling does not occur if the separate property can be traced into its product or if the separate property continues to be segregated." *Eldridge v. Eldridge*, 137 S.W.3d 1, 14 (Tenn. Ct. App. 2002). Wife does not argue that tracing is possible in this case, and from our thorough review of the bank statements on the parties' joint account, we see no way to trace the distribution income.

Husband contends further that the parties' substantial contribution to the preservation and appreciation of Wife's companies is shown by the use of marital funds to pay their income tax liabilities arising out of the income that was retained by each of the companies but included on the parties' joint tax return. Husband contends that, because the parties used marital funds from the parties' joint account to pay the tax liability associated with the income retained in Wife's companies, Wife's companies were able to retain Wife's earnings instead of distributing the funds to Wife to cover the taxes. This allowed the companies to grow and appreciate in value. In fact, as Husband points out, in 2005, virtually Wife's entire share of the income earned by the companies was retained by the companies. The resulting 2006 tax liability associated with the retained earnings necessitated the liquidation of the parties' joint brokerage account, consisting primarily of Husband's inheritance. Husband argues that the payment with marital funds of the parties' tax liabilities associated with the income retained in the companies constitutes a substantial contribution by both parties.

To address this argument, we discuss each company separately.

As to CCP, similar to *Schuett*, marital funds were used to pay the tax liabilities created by the income that was retained by CCP. Prior to 2006, the parties paid their income tax liabilities associated with CCP with their employment income. In 2006, their tax liabilities arising in part from income retained by CCP but attributed to Wife for tax purposes were paid with marital funds from the liquidated joint brokerage account.[3] At the time, Husband testified, the parties explored the possibility of CCP distributing some of the retained income to Wife to cover the parties' suddenly large tax liabilities, but "the bottom line was that there wasn't going to be a distribution to cover this tax liability." The parties' use of marital funds to cover their tax liabilities arising out of the CCP income that was attributed to Wife but not distributed to her allowed CCP to retain income that could have been utilized to pay the parties' income taxes. This helped preserve CCP and allowed it to grow and appreciate in value. Under these circumstances, we find a causal link between the use of the parties' marital funds and the preservation and appreciation in value of CCP.

The analysis as to Young Leasing is slightly more complicated. After Young Leasing was created in 1999, it operated at a loss until 2005. Thus, in the absence of any income - retained or otherwise - from Young Leasing between 1999 and 2005, the parties had no associated income tax liabilities. In 2005, however, Young Leasing generated income attributed to Wife for tax purposes of approximately $619,000. This resulted in substantially increased tax liability for the parties in 2006, without the corresponding actual income to pay the taxes. Again, in 2006, to pay these taxes, the parties liquidated their joint brokerage

_____

[3]As discussed below, after 2006, the parties' tax liabilities were paid with the quarterly distributions made by Young Leasing.

-15-

account, which had contained Husband's inheritance. Some $317,000 from this joint account was used to pay the increased tax liability associated with the income generated and retained by Young Leasing, CCP, and all other income earned by the parties that tax year. The parties' combined tax liability for 2006 totaled approximately $331,000. After 2006, of course, Young Leasing began issuing distributions to Wife in the amount of $75,000 quarterly to cover the tax liabilities associated with the income from Young Leasing, both retained and distributed, as well as the taxes on all other income earned by the parties. The distributions were deposited into the parties' joint checking account quarterly and shortly after that the parties' quarterly tax payments were made.

It is questionable whether the payment of the parties' taxes after 2006 constituted a substantial contribution by the parties to the preservation and appreciation of Young Leasing. Husband testified that the $75,000 quarterly distributions from Young Leasing were made "in correlation to the quarterly tax estimates that would be due." The quarterly distributions were essentially funneled through the parties' joint bank account to the IRS, to pay the taxes owed by the parties on both companies.

The payment of the parties' 2006 tax liability, however, is another matter. In 2006, Young Leasing retained income attributed to Wife, and the parties clearly utilized marital funds to pay the associated tax liability. While it was a one-time payment, the amount of the parties' overall tax liability was substantial, $331,000; as was the amount in the joint brokerage account, namely, $317,000 that was inherited by Husband. To be considered a substantial contribution to the preservation and appreciation of a spouse's separate property, the parties' contribution "need not be monetarily commensurate to the appreciation in the separate property's value, nor must [it] relate directly to the separate property at issue." *Wright-Miller v. Miller*, 984 S.W.2d at 944 (citing *Brown*, 913 S.W.2d at 167). Under the circumstances, it is fair to find a causal link between the expenditure of these marital funds in 2006 and the preservation and appreciation in value of Young Leasing in 2006.

In addition, the proof showed that, during the parties' marriage, Husband served as the family's financial manager and Wife had little knowledge of or involvement in their financial matters. Under Section 36-4-121(b)(1)(D), quoted above, substantial contribution may include "the direct or indirect contribution of a spouse as . . . family financial manager, together with such other factors as the court having jurisdiction thereof may determine." Tenn. Code Ann. § 36-4-121(b)(1)(D). This is of particular significance with respect to the payment of the parties' 2006 tax liability, since the proof showed that the unexpected 2005 income attributed to the parties but not distributed to them necessitated hasty action by Husband to cover the parties' suddenly imminent tax liability.

Considering all of these circumstances, we must conclude that the evidence preponderates in favor of a finding that the parties made real and significant contributions to appreciation and preservation of both Young Leasing and CCP. Consequently, we must hold that the appreciation in value of both companies during the marriage is marital property.

This holding requires us to remand the case to the trial court. On remand, the trial court must, of course, equitably divide the appreciation in value of both CCP and Young Leasing during the marriage. In addition, however, adding the appreciation in these companies to the marital estate significantly affects the size of the overall marital estate. Consequently, on remand, the trial court may, in its discretion, reconsider its equitable division of the entire marital estate, in light of all factors it deems relevant.

Finally, Husband seeks an award of attorney fees both at trial and on appeal. After reviewing Husband's arguments, we find no abuse of the trial court's discretion in its denial of Husband's request for attorneys fees below. We respectfully decline to award Husband attorney fees on appeal. The remaining issues raised on appeal are pretermitted.

## CONCLUSION

The decision of the trial court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this Opinion. Costs on appeal are assessed one-half against Defendant/Appellant George Curtiss Telfer and his surety, and one-half against Plaintiff/Appellee Melody Crunk Telfer, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE