IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 15, 2019 Session

## JONATHAN GEORGE CARTER v. ELIZABETH JO BROWNE

**Appeal from the Circuit Court for Shelby County**
**No. CT-002251-15  Valerie L. Smith, Judge**

_____

### No. W2018-00429-COA-R3-CV

_____

Following a bench trial, the trial court entered a final decree of divorce in which it determined that Appellant/Wife was not entitled to an award of alimony in futuro, but awarded Wife alimony in solido and transitional alimony. The trial court further determined that the parties' marital residence was Wife's separate property. On appeal, Wife argues that the trial court erred in denying her alimony in futuro, while Appellee/Husband appeals the classification of the parties' home as Wife's separate property. With respect to the trial court's decision that alimony in futuro is inappropriate in this case, we affirm. However, because we conclude that the trial court erred in classifying the parties' home as Wife's separate property, we reverse in part and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and WILLIAM B. ACREE, JR., SR. J., joined.

Caren B. Nichol and Regan S. Sherwood, Memphis, Tennessee, for the appellant, Elizabeth Jo Browne.

Robert L. J. Spence, Jr., and Bryan M. Meredith, Memphis, Tennessee, for the appellee, Jonathan George Carter.

## OPINION

### Background

The parties, Elizabeth Jo Browne ("Wife") and Jonathan George Carter ("Husband") were married in May of 2008 and have no minor children together. Husband

filed a complaint for divorce in the Circuit Court of Shelby County ("trial court") on May 27, 2015, and Wife responded with an answer and counter-complaint for divorce on November 10, 2015. Further, Wife requested that she be awarded possession of the parties' marital home, as well as alimony both pendente lite and permanent. A divorce referee granted Wife's request for pendente lite support after a hearing held on December 3, 2015, and ordered Husband to pay Wife $3,000.00 per month in temporary transitional alimony to be applied retroactively to the filing of Wife's counter-complaint for divorce.

The parties in the present case are both trained in the field of information technology ("IT") and have previously held steady jobs. However, Wife was laid off in 2012 and has not returned to work since, which she maintains is due to her diagnosis with Ehlers-Danlos Syndrome ("EDS").[1] Likewise, Husband left his IT job in May of 2015 in order to move to Washington State and become a partner in his brother-in-law's marijuana business, which resulted in a significant pay decrease as well as the loss of health insurance for the parties.

Throughout the marriage, the parties resided in a home previously owned by Wife's family, located at 245 Windover Road, Memphis, Tennessee ("245 Windover" or "the Windover property"). In 2009 Husband's name was added to the property's deed to enable the parties to take out a home equity line of credit ("HELOC") which was used to make substantial improvements to the property. Wife's father, however, is also named on the deed as a tenant in common with the parties. Accordingly, the parties' pre-trial disputes centered on their finances and whether the home constituted marital property subject to division. Indeed, Husband denied that Wife was entitled to permanent alimony but maintained that he should be awarded an interest in the marital home, while Wife maintained that she was entitled to permanent alimony and that the Windover property should be classified as her separate property and awarded entirely to her.

After a period of discovery and several continuances, the case proceeded to trial on September 7, 2017 and lasted for three days. In addition to the testimony of the parties, the trial court heard from Wife's father ("Mr. Browne"), several of Wife's friends and family members, and a psychologist called by Husband. Additionally, the trial court accepted the deposition testimony of Wife's physician, Dr. Thomas Morgan ("Dr. Morgan"), which was entered by Wife.

The first witness called was Mr. Browne, who primarily testified about his joint ownership of the parties' home and his observations of how Wife's EDS has affected her. Mr. Browne testified that the Windover property has been in his family for many years, and that the home was built by his grandparents in 1948. According to Mr. Browne, he placed his daughter's name on the deed in 2008 when she married Husband, and then

---

[1] As discussed *infra*, Wife's physician explained in his deposition that EDS is a "disorder of connective tissue" that can cause a "bewildering array of symptoms."

added Husband's name to the deed in 2009 in order for Husband to obtain a HELOC.[2] Mr. Browne alleged that although he added Husband's name to the deed, he never intended for Husband to retain any ownership interest in the property. Mr. Browne also testified that when he placed Husband's name on the deed in 2009, Wife, Mr. Browne, and Husband executed a written agreement stipulating that Husband's name was only being added to the deed for the purpose of obtaining the HELOC.[3] As such, Mr. Browne's testimony was that he never intended to give the home to Husband and Wife.

In addressing Wife's EDS, Mr. Browne testified that Wife often needs help with chores around the house and is sometimes unable to drive. As such, Mr. Browne frequently runs errands for his daughter, and has assisted her both physically and financially since the parties' separation. Ultimately, it was Mr. Browne's position that the primary reason for the parties' divorce was Husband's inability to "control his spending."

In that vein, the bulk of Husband's testimony focused on the parties' financial disputes and the improvements to 245 Windover. While Husband admitted to leaving his Wife and moving to Washington, Husband opined that the primary reason behind the breakdown of the marriage was Wife's excessive spending and her decision not to seek employment after being laid off in 2012.

Husband recalled moving into the Windover property when the parties married in 2008, and testified that at that time the property was in state of substantial disrepair. Specifically, Husband stated that there was no insulation in the home, the windows needed replacing, there was a pest infestation, the foundation was not structurally sound, and that there were numerous other issues with the home and the surrounding property.[4] In addressing the improvements to the Windover property, Husband testified that the parties used the HELOC funds, as well as other joint marital funds, to make the following additions to the property: an 800-foot cedar fence, several security doors, a new garage door, new windows, a new roof, carpets and area rugs, a deck and an in-ground pool, a mosquito prevention system, a sunroom, and a new HVAC system. Husband also testified that the parties painted the interior of house and improved the landscaping extensively, including re-sodding the yard and planting rose bushes. Although some of the renovations were done by third parties, Husband testified that he and his family did some of the improvements themselves, for instance, constructing the 800-foot fence.

Eventually, according to Husband, the debt incurred by the renovations rose to $252,000.00. Husband also admitted that some of the funds from the HELOC went towards paying off his pre-marital debt, including a judgment from Husband's first

---

[2] It is undisputed that before the parties obtained the HELOC, there was no debt associated with 245 Windover.

[3] There is no evidence of this agreement in the record.

[4] 245 Windover sits on nearly two acres of land.

divorce as well as debt associated with Husband's vehicle and boat. While Husband agreed that Mr. Browne originally placed Husband's name on the deed in order for the parties to obtain the HELOC, Husband disputed that the parties executed a written agreement stating that Husband had no ownership interest in the property. Rather, Husband testified that all he remembered signing was a "note" associated with the HELOC, and opined that he "thought [he] had a third ownership of [the Windover property]."

Husband did not dispute that Wife was diagnosed with EDS in 2012, and in fact testified that he was present at the time of her diagnosis. It was Husband's overall position, however, that Wife behaved irresponsibly after being diagnosed in that she refused to reduce her spending or agree to a reasonable budget, despite the fact that she was no longer working. Husband testified that he encouraged Wife to seek at least part-time employment, and expressed his belief that Wife could still work in the IT industry despite her EDS diagnosis. In support, Husband offered into evidence a copy of Wife's online dating profile, in which Wife stated that despite her EDS, Wife manages to live a somewhat normal, active lifestyle. Although Husband cited numerous reasons for the failure of the marriage, Husband seemed to suggest that the parties' deteriorating financial situation and Wife's refusal to seek employment after her diagnosis were the primary factors underpinning Husband's decision to seek a divorce.

On balance, Wife reiterated Mr. Browne's testimony that Husband was never an intended owner of 245 Windover, and that Husband's name was only added to the deed so that the parties could pay off Husband's premarital debt and renovate their home. Wife agreed, however, that the parties used the majority of the HELOC funds to make significant improvements to 245 Windover. Although Wife did not dispute Husband's testimony that the parties did the renovations and improvements together, Wife's overall testimony reflected her belief that Husband was the more financially irresponsible party and that his excessive spending ultimately led to the divorce.

Most of Wife's testimony, however, focused on her EDS diagnosis. According to Wife, she was first diagnosed with EDS in October of 2012 and since that time has experienced progressively worse symptoms. As such, Wife maintained that she is unable to work and took issue with Husband's assertion that Wife is capable of holding at least a part-time IT job. In describing how EDS has affected her, Wife testified that she suffers from chronic pain and fatigue that often renders her unable to get out of bed or leave the house for days at a time. In addition to the physical symptoms, Wife testified that her EDS causes her to have "brain fog" and memory issues, which Wife asserts keeps her from seeking re-employment in the IT industry. According to Wife, her education and training in IT is focused on "writing code", which she testified is now impossible due to her neurological symptoms. Wife admitted, however, that she has not attempted to write code since her EDS diagnosis.

Wife further testified that since her separation from Husband she has struggled financially and admitted that on two occasions she has fallen behind on the loan payments for the Windover property. Although Wife applied for disability benefits in 2016, Wife's claim was denied and her appeal was pending at the time of trial. When questioned about her belief that Husband should pay Wife alimony for the rest of her life, Wife opined that her request was fair "because [Wife] was committed to the marriage and saw [herself] retiring and living with [Husband] until [they] died." Accordingly, Wife was adamant that she has no intention of returning to work.

In support of her position that she is unable to work due to her EDS, Wife also called several friends and family members to opine as to her limited mobility, chronic pain, and fatigue.[5] Moreover, Wife entered the deposition testimony of the physician who originally diagnosed Wife with EDS, Dr. Morgan. Dr. Morgan's testimony reflects that Wife was diagnosed with EDS in 2012, and that Wife suffers from what is referred to as "type 3" EDS or "hypermobility" EDS. According to Dr. Morgan, type three EDS is the least severe and most common form of the disorder. Dr. Morgan further testified that EDS causes a wide array of symptoms, including chronic pain throughout the body, painful hypermobility of the joints, irritable bowel syndrome, and chronic fatigue. While Dr. Morgan confirmed that chronic joint pain is the predominant symptom of EDS, he opined that "[i]t is not just about the joints[,]" and that EDS "actually is a systemic disorder, meaning the entire body is affected."

Although Dr. Morgan's deposition testimony confirmed that Wife has indeed been diagnosed with EDS, he also acknowledged that he only treated Wife on two occasions and that he had no opinion as to whether Wife's disorder prohibited her from working. Dr. Morgan testified that Wife reported to him that her EDS was interfering with her ability to work, but he also noted that this determination was based solely on Wife's self-reporting. Indeed, Dr. Morgan testified that he only knew that Wife considered herself unable to work because "[Wife and Dr. Morgan] discussed disability back in 2012, and then five years later [Wife] was continuing to discuss disability[.]" Accordingly, Dr. Morgan admitted on cross-examination that Wife was never classified as "disabled" by him or, to his knowledge, any other doctor that Wife had seen.

Finally, the trial court heard testimony from Husband's expert witness, Dr. Ross Strausser, Ph.D. ("Dr. Strausser"), who described himself as an expert in "rehabilitation psychology" and "vocational disability." Dr. Strausser testified that in preparation for his testimony, he had reviewed Dr. Morgan's deposition testimony, Wife's deposition testimony, Wife's online dating profile, and the transcript of the temporary support hearing held on December 3, 2015. Having reviewed those documents, it was Dr. Strausser's opinion that Wife was not precluded from "functioning at the level necessary

---

[5] This testimony is largely cumulative and not necessary to detail for resolution of this appeal.

to perform employment," and Dr. Strausser opined that Wife's medical records actually suggested that she should attempt to maintain a normal life.

The trial court issued its oral ruling on November 21, 2017, and entered its written order on February 7, 2018, wherein it granted Wife's counter-complaint for divorce and dismissed Husband's complaint. The trial court concluded that Wife, Mr. Browne, and Husband reached an agreement in 2009 that Mr. Browne never intended "to give [Husband] any right or interest in the [Windover property]." In so deciding, the trial court concluded that Husband had acknowledged this agreement at trial, and that his acknowledgment "[overcame] any showing of transmutation" of the Windover property. Accordingly, the Windover property was classified as Wife's separate property and was awarded, along with the property's remaining debt, to Wife. Further, the trial court found that Husband engaged in excessive spending during the marriage and that at the time of trial Husband had greater earning capacity than Wife. The trial court also acknowledged that Wife had helped pay off Husband's premarital debt and as such, awarded Wife an alimony in solido allocation of 68,250.00[6], as well as transitional alimony in the amount of $2,000.00 per month for two years. In rejecting Wife's request for alimony in futuro, however, the trial court noted that Wife had failed to offer clear evidence as to how her EDS affected her ability to work. While the trial court acknowledged Wife's EDS diagnosis, it also noted that Wife's dating profile conflicted with Wife's testimony, and further pointed out that Dr. Morgan's testimony was based on "subjective evidence." The trial court also noted that the short duration of the parties' marriage weighed against an award of alimony in futuro. Finally, the trial court concluded that Husband's testimony was not credible and that the opinions of his expert, Dr. Strausser, were not particularly helpful in light of the fact that Dr. Strausser never evaluated Wife.

Wife filed a timely notice of appeal to this Court on March 9, 2018.

## Issues Presented

Wife raises one issue on appeal:

1. Whether the trial court erred in concluding that Wife is not entitled to an award of alimony in futuro.
In his posture as the appellee, Husband raises an additional issue for review:

2. Whether the trial court erred in concluding that the 245 Windover property is Wife's separate property rather than marital property subject to equitable division.

## Discussion

---

[6] The alimony in solido award was also based on the trial court's finding that Husband had dissipated marital assets in moving to Washington.

Here, the two issues presented address the trial court's award of alimony and its division of the marital estate. We address each of these issues in turn, beginning with Wife's assertion that the trial court erred in concluding that Wife was not entitled to an award of alimony in futuro.

## I. Alimony

The standard of review applicable in alimony cases was thoroughly considered in the Tennessee Supreme Court's opinion in *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011):

> [T]his Court [has] repeatedly and recently observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court,

such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. ***Wright***, 337 S.W.3d at 176; ***Henderson***, 318 S.W.3d at 335.

*Gonsewski*, 350 S.W.3d at 105−06 (footnote omitted).

Currently, Tennessee law recognizes four types of spousal support: "(1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony." *Gonsewski*, 350 S.W.3d at 107 (citing Tenn. Code Ann. § 36-5-121(d)(1)). In the present case, the trial court awarded Wife alimony in solido in the amount of $68,250.00, as well as transitional alimony in the amount of $2,000.00 a month for two years.[7] Alimony in solido is awarded "to adjust the distribution of the parties' marital property" and "may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate." *Gonsewski*, 350 S.W.3d at 108 (citing ***Burlew*** 40 S.W.3d at 471); Tenn. Code Ann. § 36-5-121(d)(5)). Alimony in solido is typically paid as a lump sum or as installments for a fixed term. *Id.* Transitional alimony, on the other hand, is appropriate when "the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce[,]" and is thus a "form of short term support. . . . payable for a definite period of time." *Id.* As discussed, the trial court concluded that both alimony in solido and transitional alimony were appropriate in this case.

The trial also concluded, however, that Wife was not entitled to an award of alimony in futuro. This type of alimony is appropriate when

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.

*Gonsewski*, 350 S.W.3d at 107−08 (citing Tenn. Code Ann. § 36-5-121(f)(1)). According to the Tennessee Supreme Court:

> Alimony in futuro "is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse." ***Riggs***, 250 S.W.3d at 456 n. 2. In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage. ***Robertson***, 76 S.W.3d at 340. While enabling the spouse with less income "to maintain

---

[7] Wife's transitional alimony is subject to change if or when her appeal for disability benefits is decided by the Social Security Administration.

the pre-divorce lifestyle is a laudable goal," the reality is that "[t]wo persons living separately incur more expenses than two persons living together." *Kinard*, 986 S.W.2d at 234. "Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle . . . ." *Id.* It is not surprising, therefore, that "[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony." *Robertson*, 76 S.W.3d at 340.

*Gonsewski*, 350 S.W.3d at 108.

In order to determine whether to award alimony and, if so, the amount and duration of the award, the court is directed to consider several factors, including the age, mental condition, and physical health of the parties, the length of the marriage, the parties' relative earning capacities, the separate assets of the parties, the provisions made with regard to marital property, and the standard of living the parties enjoyed during the marriage. *See* Tenn. Code Ann. § 36-5-121(i). Although the trial court should consider all relevant factors, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457); *see also* *Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 342; *Burlew*, 40 S.W.3d at 470.

Here, Wife asserts that the trial court's decision to deny her alimony in futuro was an abuse of discretion, arguing that the trial court failed to properly take into account all of the enumerated factors of section 36-5-121(i). In particular, Wife takes issue with the trial court's statement that a marriage of only seven years[8] does not warrant alimony in futuro, and further contends that Wife's EDS necessitates an award of alimony in futuro. Wife argues that "short-term assistance to adjust to the economic consequences of this divorce will be insufficient, since [Wife's] ability to seek gainful employment will only decrease due to her chronic disease." Essentially, Wife posits that under these circumstances, her physical health should be the dispositive factor in determining whether alimony in futuro is appropriate.

_____

[8] There appears to be some confusion over the duration of the parties' marriage. Husband argues that the parties were married for seven years, using the date of the parties' separation as the end date. Wife, on the other hand, asserts that the parties were married for nine years and marks the end of the marriage by the date of the actual dissolution of the marriage. The trial court's order on this point is unclear, as the trial court at one point refers to the marriage as a nine year marriage, and later refers to it as a seven year marriage. While we have determined that this confusion does not affect the outcome of the present appeal, we note that this Court has previously determined the length of a marriage by considering the date of marriage and the date of the entry of the final decree of divorce. See *Jackman v. Jackman*, 373 S.W.3d 535, 546 (Tenn. Ct. App. 2011) (concluding that the parties had been married for ten years where the parties were married in February of 1996 and the final decree of divorce was entered in April 2006, and further concluding that the trial court did not abuse its discretion in finding that the marriage was one of "short duration").

- 9 -

In support of her argument, Wife relies heavily on *Crocker v. Crocker*, No. W2006-00353-COA-R3-CV, 2006 WL 3613591 (Tenn. Ct. App. Dec. 11, 2006), a case which Wife asserts is factually analogous to the one at hand. In *Crocker*, the husband filed a complaint for divorce after only five years of marriage. *Id.* at *1.The husband was a self-employed farmer, while the wife worked as a housekeeper. *Id.* In requesting alimony in futuro, the wife alleged that she suffered from severe rheumatoid arthritis and was thus unable to continue working to support herself. *Id.* The trial court agreed with the wife, and ordered the husband to pay her $3,000.00 per month until her remarriage or death. *Id.* The trial court noted that under those particular circumstances, the wife's need was severe; indeed, her only source of income was $548.00 per month in disability benefits. *Id.* Further, the wife's medical costs subsumed what little she had, as she was taking fifteen different medications and receiving other various treatments related to her condition. *Id.* In contrast, the trial court found that husband's net worth had vastly increased in the years leading up to the trial. *Id.*

On appeal, the husband argued in part that the short duration of the parties' marriage rendered alimony in futuro inappropriate. *Id.* at *4. This Court, however, affirmed the trial court's ruling in light of the wife's severe disability. *Id.* at *5−*6. In upholding the alimony in futuro award, we pointed out that at trial, wife offered the deposition testimony of her physician who opined that the wife had a particularly severe case of rheumatoid arthritis that indeed rendered her disabled. *Id.* at *4. In the physician's opinion, the wife was disabled for the remainder of her life. *Id.* As such, we concluded that in light of the totality of the circumstances of that case, alimony in futuro was justified notwithstanding the short duration of the marriage. *Id.* at *5.

Important factual differences undermine Wife's reliance on *Crocker*. Namely, the wife in *Crocker* offered undisputed medical testimony that she had been disabled for several years and was unable to work. Here, however, the evidence of Wife's alleged disability is sharply disputed. While Dr. Morgan confirmed that Wife has been diagnosed with EDS, he never testified that, in his opinion, Wife's EDS inhibits her from working. Rather, Dr. Morgan testified that Wife reported to Dr. Morgan that her EDS was, to some extent, interfering with her life. Dr. Morgan acknowledged, however, that "other than my personal observations and [sic] what [Wife] says to me, I don't have any other way to know what's going on in her life." Later in his deposition, Dr. Morgan admitted that Wife was never designated as "disabled" in her medical records. Simply put, Dr. Morgan only testified as to what Wife relayed to him as far as her impressions of how EDS impairs her ability to work.

Moreover, another expert directly contested Wife's claim of an inability to maintain employment after reviewing the relevant evidence. When legitimate but competing expert proof is presented on an issue, the choice of which expert's theory to credit is generally the fact-finder's prerogative. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005) ("The weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact."); *State*

*v. Leifer*, No. W2012-00320-CCA-R3-CD, 2013 WL 2404064, at *11 (Tenn. Crim. App. May 30, 2013) ("The jury heard competing theories from the State's expert and the defense expert and credited the State's expert, as was its prerogative."). The husband in **Crocker** presented no expert proof to contradict the wife's claim of disability.

The only other evidence offered by Wife at trial to support the contention that she is unable to work was testimony of various friends and family members that Wife is often unable to attend social functions, and that Wife attributes this to her EDS. Respectfully, testimony from Wife's friends and family that she is often unable to socialize with them is simply not the same as testimony from a medical professional that Wife's condition renders her unable to work for the rest of her life. Further, at the time of trial the Social Security Administration had denied Wife's claim for disability, noting that Wife was "not disabled under [Social Security Administration] rules."

Also differentiating **Crocker** from the present case is the trial court's conclusion that Wife's testimony regarding her EDS was inconsistent with other evidence. At trial, Husband entered a copy of Wife's online dating profile which Wife admitted to creating. While Wife contended at trial that her EDS is so debilitating that she is unable to hold even a part-time IT position, her dating profile suggests that she lives a "somewhat normal life" and that her "[b]ad days usually just mean that [Wife has to] stay home, chill and make it a movie night." The profile goes on to discuss Wife's affinity for playing pool, waterskiing, camping, home improvement projects, and "danc[ing] around like a total idiot." Again, no such evidence was presented in **Crocker** to undermine the wife's claimed disability.

Contrary to Wife's argument, the record reflects that the trial court properly considered all of the relevant factors under section 36-5-121(i). Simply because Wife ascribes greater weight to the factor regarding her physical health does not necessarily mean that the trial court was required to undertake the same analysis, especially in light of the conflicting evidence on Wife's ability to work. *See* **Gonsewski**, 350 S.W.3d at 105 ("a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors.") (citing **Kinard**, 986 S.W.2d at 235). We are also unconvinced by Wife's assertion that the trial court based its decision solely upon the short duration of the parties' marriage; on the contrary, the trial court acknowledged Wife's physical health, as well as other factors,[9] in both its oral ruling and its written order. The trial court also noted in both the oral and the written ruling that it had indeed considered all of the factors contained in Tenn. Code Ann. section 36-5-121(i). The fact that the trial court considered the parties' marriage to be of short duration was only one small portion of the analysis, and we cannot say that the trial court abused its discretion simply because Wife reached a different conclusion in weighing the factors. In light of

---

[9] For example, the trial court also mentioned the age, mental condition, and financial condition of both parties, both parties' education and work experience, the relative fault of both parties, and the division of the marital property. *See* Tenn. Code Ann. § 36-5-121(i) (1), (2), (4), (8), & (11).

this Court's responsibility to "review the evidence in the light most favorable to the decision[,]" we cannot conclude that the trial court erred in its determination that alimony in futuro was inappropriate in this case. ***Gonsewski***, 350 S.W.3d at 106 (citation omitted).

A party seeking to overturn a trial court's discretionary decision "undertakes a heavy burden." ***State ex rel. Jones v. Looper***, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). Because Wife has not satisfied her burden in showing how the trial court abused its discretion in denying her alimony in futuro, we affirm the trial court's decision.

## II.     Division of Property

We turn next to Husband's argument on appeal that the trial court abused its discretion in determining that the Windover property is separate, rather than marital, property. As a threshold matter, we must note that Husband failed to comply with Tennessee Court of Appeals Rule 7, which provides that

> In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in form substantially similar to the form hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

Wife argues that because of Husband's noncompliance with Rule 7, his appeal is subject to dismissal. Although Wife has correctly pointed out that failure to comply with Rule 7 can result in waiver of the issues raised on appeal, we have also held that this Court may "exercise [its] discretion under Rule 1(b) of the Rules of the Court of Appeals and consider the merits of the appeal, despite [a party's] failure to comply with Tenn. Ct. App. R. 7." ***Telfer v. Telfer***, No. M2012-00691-COA-R3-CV, 2013 WL 3379370, at *7 (Tenn. Ct. App. June 28, 2013) (citing ***Harden v. Harden***, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010); Tenn. Ct. App. R. 1(b)). In the present case, Husband's appeal is limited to the narrow issue of the classification of the parties' home as Wife's separate property. Under these circumstances, we exercise our discretion to consider the merits of the appeal, despite Husband's failure to comply with Tenn. Ct. App. R. 7.

Our supreme court has explained that "the classification of particular property as either separate or marital is a question of fact to be determined in light of all the relevant circumstances." ***Snodgrass v. Snodgrass***, 295 S.W.3d 240, 245 (Tenn. 2009). Trial courts are afforded broad discretion "when classifying and dividing a marital estate, and their decisions are entitled to great weight on appeal." ***Eldridge v. Eldridge***, 137 S.W.3d

- 12 -

1, 12 (Tenn. Ct. App. 2002) (citing **Goodman v. Goodman**, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999)); *see also* **Dunlap v. Dunlap**, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998) ("the trial court's classification and division of marital property enjoys a presumption of correctness and will be reversed or modified only if the evidence preponderates against the court's decision."). As such, we do not disturb the trial court's decision on appeal unless the distribution of property "lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law." **Snodgrass**, 295 S.W.3d at 245 (citing **Keyt v. Keyt**, 244 S.W.3d 321, 327 (Tenn. 2007)). With regard to the trial court's findings of fact, our review of the record is de novo with a presumption of correctness, "and we must honor those findings unless there is evidence which preponderates to the contrary." **Id.** Finally, we give the trial court's credibility determinations great weight on appeal, because the trial court is in the best position to assess the credibility of the parties. **Pate v. Pate**, No. W2005-00883-COA-R3-CV, 2006 WL 1994536, at *5 (Tenn. Ct. App. Feb. 22, 2006) (citing **Whitley v. Whitley**, No. M2003-00045-COA-R3-CV, 2004 WL 1334518, *7 (Tenn. Ct. App. June 14, 2004)).

Before we address Husband's argument that the trial court's classification of the Windover property was erroneous, "it is helpful to review some well-settled principles of our divorce jurisprudence." **Smith v. Smith**, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002). As our supreme court has explained,

> Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property." When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. "Separate property" is not part of the marital estate and is therefore not subject to division. Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

**Snodgrass**, 295 S.W.3d at 246. Tennessee Code Annotated section 36-4-121(b) contains the definition for both marital and separate property, providing in relevant part that

> "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date. In the case of a complaint for legal separation, the court may make a final disposition of the marital property either at the time of entering an order of legal separation or at the time of

- 13 -

entering a final divorce decree, if any. If the marital property is divided as part of the order of legal separation, any property acquired by a spouse thereafter is deemed separate property of that spouse.

Tenn. Code Ann. § 36-4-121(b)(1)(A). This section goes on to explain that "Separate property" means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent;

(E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and

(F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2).

Nonetheless, it is well-settled that separate property is not indelibly separate; rather, separate property can be treated "in such a way as to give evidence of an intention" that it is to become marital property. *Smith*, 93 S.W.3d at 878 (citing 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (1987)). This concept is known as transmutation. *Id.* The *Smith* court further noted that "one method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. . . . [t]he rationale underlying [transmutation] is that dealing with property in [this] way creates a rebuttable presumption of a gift to the marital estate." *Id.* Consequently, we have repeatedly held that joint ownership of a marital residence gives rise to a presumption that the property is marital rather than separate, even where the property was one spouses' separate property prior to the marriage**. *Wright Miller v. Miller*, 984 S.W.2d 936, 941 (Tenn. Ct. App. 1998); *Hayes v. Hayes*, No. W2010-02015-COA-R3-CV, 2012 WL 4936282, at *11 (Tenn. Ct. App. Oct. 18, 2012); ***Douglas v.***

- 14 -

*Douglas*, No. W2015-02044-COA-R3-CV, 2016 WL 4198434, at *4 (Tenn. Ct. App. Aug. 8, 2016).

This presumption, however, can be overcome by showing "evidence of circumstances or communications clearly indicating an intent that the property remain separate." *Smith*, 93 S.W.3d at 878; *see also Hayes*, 2012 WL 4936282, at *11 ("The presumption created by joint ownership is not always controlling and can be overcome by evidence of contrary conduct by the parties and the manner in which the parties themselves treated the property.") (citations omitted). In determining whether a home previously owned separately by one spouse has become marital property, this Court bears in mind the following:

> (1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property. Accordingly, our court has classified separately owned real property as marital property when the parties agreed that it should be owned jointly even though the title was never changed, or when the spouse owning the separate property conceded that he or she intended that the separate property would be converted to marital property.

*Hayes*, 2012 WL 4936282, at *12 (citing *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006)).

In the present case, Husband argues that the trial court erred in concluding that the Windover property is Wife's separate property. The impetus of this dispute is the trial court's finding that although the property has been jointly titled in the parties' names since 2009, Wife overcame the presumption that the property is marital with the evidence she presented at trial. Indeed, Wife claims that she, Mr. Browne, and Husband came to an agreement in 2009 that despite Husband's name being placed on the deed to the Windover property, Husband was never an intended owner of the property. Rather, Wife and Mr. Browne insisted at trial that Husband's name was only added to the deed in order to make Husband eligible for a HELOC to use for improvements to the Windover property. The trial court concluded that based on this testimony, Wife successfully rebutted the presumption of marital property created by Husband and Wife's joint ownership. In so finding, the trial court stated that

> [a]n agreement existed between Husband, Wife, and Wife's father regarding the home at 245 Windover, Memphis, Tennessee (the "Real Property"). It was never Wife's Father's intention to give Mr. Carter any right or interest in the Real Property. This intent acknowledged by Mr. Carter overcomes any showing of transmutation. . . . The proof at trial

- 15 -

overcomes Husband's argument that the real property was transmuted. The Court finds that the real property is Wife's separate property.

In the trial court's view, the testimony of Wife and Mr. Browne was sufficient to rebut the presumption of marital property created by the joint titling. Husband urges on appeal, however, that the Windover property became marital property "pursuant to the doctrine of transmutation arising from the conduct of the parties during the course of the marriage." Husband also takes issue with the trial court's finding that Husband agreed with Wife and Mr. Browne at trial regarding the 2009 agreement, as Husband avers that (1) he does not remember signing such a document, and (2) that he never testified as to the agreement at trial. Moreover, Husband argues that the evidence at trial conclusively establishes that the property has been transmuted into marital property.

To buttress his argument, Husband relies primarily on ***Hayes v. Hayes***, No. W2010-02015-COA-R3-CV, 2012 WL 4936282 (Tenn. Ct. App. Oct. 18, 2012). In ***Hayes***, the parties sought a divorce after six years of marriage, and the litigation centered mainly on dividing several pieces of real property between the parties. ***Id.*** at *1.The wife in ***Haye***s owned a home before the parties were married, and eventually added husband's name to the title so that the parties could obtain a HELOC to pay for various expenses. ***Id.*** Like the present case, the wife in ***Hayes*** executed a quitclaim deed transferring title to the home to both parties jointly. ***Id.*** When the trial court divided the parties' property in the divorce, it classified the home as wife's separate property, noting that "it was never any intention on [wife's] part to transfer any portion of that residence to [Husband]." ***Id.*** at *5.

On appeal, the husband argued that the trial court erred in classifying the parties' home as wife's separate property; in support, husband noted that the parties lived in the home for the duration of their marriage and sometimes paid the mortgage out of a joint bank account. The husband also alleged that he had made substantial improvements to the property during the marriage. ***Id.*** at *3, *10. The wife, however, disputed that husband maintained and improved the home, and argued that she was the party who primarily paid the bills for the home. ***Id.*** at *10. As such, wife maintained that "Husband [was] not entitled to any portion of [the home] as a division of marital property." ***Id.*** Wife also argued that the quitclaim deed to husband was not determinative because the parties had agreed that husband would only take title to the home to facilitate the parties' HELOC loan. ***Id.*** at *12.

This Court reversed the trial court's decision that the home was wife's separate property. ***Id.*** at *13. While we agreed with the trial court that wife had rebutted the presumption created by the joint ownership of the home, we concluded that wife's interest in the home was nonetheless converted to marital property via transmutation:

the [home] started out as [w]ife's separate property, since [w]ife owned it in her sole name prior to the marriage. However, [w]ife herself testified at trial that, when the parties married, she opened a joint bank account to pay the mortgage because she believed at the time that "when you are married, everything is together" and that she intended for the expenses associated with the [home] to be "a joint thing.". . . The parties, of course, lived together in the [home] throughout their marriage. Husband consistently made significant improvements to the home. Both parties borrowed monies from the equity in the home. While no one factor is determinative, all of this considered together is "evidence of an intention that [the home] become marital property."

*Id.* at *12.

Returning to the present case, we are persuaded by Husband's reliance on ***Hayes***. Like ***Hayes***, there were allegations at trial that Husband and Wife came to an agreement that Husband would only take title to the home for purposes of obtaining a HELOC. In ***Hayes*** this undisputed testimony was sufficient to rebut the presumption of a gift to the marital estate. ***Id.*** While the evidence in ***Hayes*** was undisputed, the trial court here made an express credibility finding against Husband regarding his dispute of this agreement. *See* ***Pate***, 2006 WL 1994536, at *5 (citing ***Whitley***, 2004 WL 1334518, *7) (noting that credibility finding are entitled to great weight on appeal). As such, like in ***Hayes***, we agree that the presumption of joint ownership is rebutted in this case. This determination, however, does not end our inquiry. Instead, like the ***Hayes*** Court, we must also determine whether the relevant factors nevertheless indicate that this property was transmuted into marital property. *See* ***Hayes***, 2012 WL 4936282, at *12. After thoroughly reviewing the record, we conclude that the Windover property has been converted from separate property to marital property due to transmutation. Indeed, nearly all of the transmutation factors addressed by the ***Hayes*** court weigh in favor of Husband in this case.

First, the parties utilized 245 Windover as their marital residence throughout the entirety of their marriage. ***Id.*** (directing the court to consider "(1) the use of the property as marital residence[.]"). Indeed, Wife even testified as to her belief that the parties would retire together on the property. Second, and perhaps most important in this case, Husband and Wife together made significant improvements to the Windover property, to the extent that the parties eventually incurred over $200,000.00 worth of debt in the process. *See* ***id.***, (directing the court to consider "(2) the ongoing maintenance and management of the property by both parties[.]"). Although Wife testified that the parties at times disagreed about money throughout the renovation process, Wife does not dispute that the parties made the decision to improve the property together, and would often use marital funds to make purchases for the renovations. Moreover, it is undisputed that the mortgage payments on the home were frequently paid by Husband or with marital funds,

and Wife testified at trial that the debt on the Windover property remains in Husband's name. As such, this factor weighs heavily in favor of Husband.

Third, there is no dispute that the Windover property is jointly titled in the parties' name. *See id.*, (directing the court to consider "(3) placing the title to the property in joint ownership[.]"). However, in light of the testimony that Husband's name was only added as a joint owner for purposes of obtaining a HELOC, this factor holds little weight in this particular case. Finally, with regard to the fourth factor, it is reasonable to infer under these circumstances that the parties used Husband's credit "to improve the property." *See id.*, (directing the court to consider "(4) using the credit of the non-owner spouse to improve the property[.]"). Indeed, it is undisputed that the parties took out a HELOC in Husband's name in order to do substantial renovations on the Windover property. While Mr. Browne insists that Husband was never intended to be a joint owner of the property, Mr. Browne nonetheless placed Husband's name on the deed in order for Husband to obtain the HELOC. Again, Wife testified that the debt remains in Husband's name. As such, the fourth factor favors Husband.

Under all of these circumstances, we must conclude that the evidence preponderates against the trial court's finding that the Windover property remained Wife's separate property. Despite Wife's contentions to the contrary, the actions of the parties throughout their marriage, "considered together[,] is evidence of an intention that [the Windover property] become marital property." *Id.* This property therefore should have been considered part of the parties' marital estate for purpose of the trial court's equitable division of property. Because the Windover property is a substantial asset and has remaining debt associated with it, we think it prudent to remand the case to the trial court for reconsideration of its division of the marital estate. We note that this issue is complicated somewhat by the fact that Mr. Browne continues to hold an ownership interest in the property. On remand, the trial court should determine what portion of the home was transmuted into marital property and thereafter determine an equitable division of the property and its associated debt in light of the other property awarded in this case.

### Conclusion

The order of the Circuit Court for Shelby County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to the Appellant, Elizabeth Jo Browne, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE